NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

PEARSON Y., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, L.Y.,
THE QUECHAN INDIAN TRIBE, *Appellees.*

No. 1 CA-JV 20-0097
FILED 9-1-2020

Appeal from the Superior Court in Maricopa County
No. JD 29791
The Honorable Sara J. Agne, Judge

**AFFIRMED**

COUNSEL

David W. Bell, Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Dawn R. Williams
*Counsel for Appellee, Department of Child Safety*

Rosette LLP, Attorneys at Law, Chandler
By Julian Angelo Nava
*Counsel for The Quechan Indian Tribe*

---

**MEMORANDUM DECISION**

---

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge David B. Gass joined.

---

**B R O W N**, Judge:

¶1        Pearson Y. ("Father") appeals the juvenile court's order terminating his parental rights to his son, L.Y., born in 2014.  Father challenges the court's findings that (1) good cause existed to deviate from the Indian Child Welfare Act ("ICWA") placement preferences, (2) the Department of Child Safety ("DCS") made active efforts to comply with such preferences, and (3) termination was in L.Y.'s best interests.  For the following reasons, we affirm.

**BACKGROUND**

¶2        Father and Lisa T. ("Mother") are the biological parents of L.Y., who is an enrolled member of the Quechan Tribe ("Tribe") and eligible for enrollment in the Navajo Nation because Father is Navajo.  L.Y. has been diagnosed with autism spectrum disorder.  Because of his developmental and behavioral needs, L.Y. receives services through the Department of Developmental Disabilities and is enrolled in the Arizona Long Term Care System, which means he has significant delays that will inhibit him for a lengthy period of time.  L.Y. attends a special daycare developmental preschool and engages in behavioral, occupational, physical, and speech therapy.

¶3        In January 2015, DCS took L.Y. into custody and filed a petition for dependency, alleging Mother and Father neglected the child.  In December, the juvenile court dismissed the dependency and returned L.Y. to Mother's custody, with Father being allowed supervised visitation with L.Y.

¶4        In March 2017, DCS again took L.Y. into custody.  In its dependency petition, DCS alleged Mother and Father were neglecting L.Y. due to substance abuse.  Mother admitted she was drinking a liter of vodka per day to help her cope with pain resulting from a domestic violence incident. DCS alleged Father was using methamphetamine.  During a team decision-making meeting, Father was "uncooperative and aggressive," and

appeared to be "under the influence of a substance." The petition also alleged Mother and Father exposed L.Y. to domestic violence in the home and failed to provide him a safe environment. DCS acknowledged L.Y. was an Indian child and stated ICWA applied. DCS notified the Navajo Nation and the Tribe of the dependency proceeding.

¶5 The juvenile court held a permanency planning hearing and pretrial conference in August 2017. Father failed to appear at the hearing, and the court found L.Y. dependent as to Father, with a case plan of family reunification concurrent with severance and adoption.

¶6 L.Y. was placed in the same foster home—a non-ICWA placement—that had provided for his care during his first year of life. Over the course of the 2017 dependency, DCS investigated several placement possibilities that complied with ICWA, including family members. The Tribe did not object to L.Y.'s foster home placement, but indicated it would seek to place L.Y. in a tribal placement if the case plan changed to severance and adoption. At a July 2018 report and review hearing, after the juvenile court denied DCS's request to change the case plan to severance and adoption, a representative for the Tribe informed the court that the Tribe and DCS were attempting to place L.Y. in an ICWA-compliant placement.

¶7 In February 2019, the juvenile court changed the case plan to severance and adoption. DCS then moved to terminate both parents' parental rights, alleging they were unable to discharge parental responsibilities because each had a history of chronic substance abuse and they failed to remedy the circumstances that caused L.Y. to be in an out-of-home-placement for more than 15 months. *See* A.R.S. § 8-533(B)(3), (8). At the contested termination hearing, the court received testimony from the parents' psychologist, DCS's safety specialist, an ICWA-qualified expert, and Mother. Father chose not to testify and the court drew a negative inference from his decision, explaining that whether Father was sober enough to be able to provide minimally adequate parenting of L.Y. was a matter "uniquely within Father's knowledge."

¶8 The juvenile court granted DCS's motion, finding DCS proved the alleged grounds as to both parents and termination was in L.Y.'s best interests. The court also addressed ICWA compliance, finding DCS engaged in active efforts to prevent the breakup of L.Y.'s family and good cause existed to depart from ICWA placement preferences. Father timely appealed. The Tribe joined in the appeal by filing a notice in support of Father's appeal pursuant to ARCAP 13(h). Mother is not a party to this appeal.

**DISCUSSION**

¶9            To terminate Father's parental rights, DCS was required to prove by clear and convincing evidence that a statutory ground for termination exists, and by a preponderance of evidence that termination is in the child's best interests.  *Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577, ¶ 4 (App. 2017); Ariz. R.P. Juv. Ct. 66(C).  In addition, because L.Y. is an Indian child, DCS had to (1) prove beyond a reasonable doubt that continued custody by Father would "likely result in serious emotional or physical damage" to L.Y., and (2) satisfy the juvenile court that active efforts were made to "provide remedial services and rehabilitative programs designed to prevent the breakup of [L.Y.'s] family and that those efforts have proven unsuccessful."  Ariz. R.P. Juv. Ct. 66(C); *see also* 25 U.S.C. § 1912(d), (f); *Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 333, ¶ 3 (2009).

¶10            Father does not challenge the juvenile court's finding that DCS proved the statutory grounds for termination by clear and convincing evidence or the court's finding that DCS established beyond a reasonable doubt that continued custody by Father would likely result in serious emotional or physical damage to L.Y.  Instead, Father's arguments are centered on whether good cause existed to deviate from ICWA's preferences for placement of a dependent child.  The Tribe supports Father's arguments.

### A.            Departure from ICWA Placement Preferences

¶11            The juvenile court may depart from ICWA placement preferences only upon a good cause finding, and we review such a finding for an abuse of discretion.  *Navajo Nation v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 339, 343, ¶ 14 (App. 2012).  We do not substitute our opinion for that of the juvenile court, and we will uphold the court's factual findings unless they are unsupported by evidence.  *Id.* at 344, ¶ 14; *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

¶12            ICWA establishes the following placement preferences: first with "a member of the Indian child's extended family," second with "a foster home licensed, approved, or specified by the Indian child's tribe," third with "an Indian foster home licensed or approved by an authorized non-Indian licensing authority," and finally, with "an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."  25 U.S.C. § 1915(b).

¶13 In finding good cause existed to depart from ICWA placement preferences, the juvenile court supported its determination based on several factors, including: (1) "no suitable options could be located despite active efforts by DCS and the tribes," (2) "the testimony of the qualified [ICWA] expert witness," (3) "the abundance of evidence showing [L.Y.'s] growth in [the current] placement," including the placement's ability to meet L.Y.'s many special needs, (4) L.Y.'s "parents' and tribes' lack of objections" to the current placement, (5) "the placement's willingness to continue exposing [L.Y.] to his cultural heritage," and (6) "the Mother's evident good, working relationship with placement."

¶14 Father argues the court lacked good cause to depart from ICWA placement preferences and DCS did not diligently attempt to find an ICWA-compliant placement. The record shows otherwise. The juvenile court clearly articulated the factors that support its good cause determination. Indeed, the court's minute entries over the course of the dependency reveal that neither Father, Mother, nor the Tribe objected to the placement, and that a Tribal representative acknowledged DCS and the Tribe had engaged in efforts to find an ICWA-compliant placement. The ICWA expert witness opined that although the placement was not ICWA-compliant, there was good cause to depart from the placement preferences because the foster home was able to meet L.Y.'s extensive special needs. And Mother testified to her positive relationship with the placement.

¶15 A court may determine, as occurred here, that departure from ICWA placement preferences is appropriate; the factors the court must consider "are case-specific, but in all cases must be balanced against the statutory presumption that placement consistent with ICWA preferences is in the best interest of the child." *Navajo Nation*, 230 Ariz. at 346, ¶24. The record shows the juvenile court based its good-cause determination on permissible factors, including, among other things, the "extraordinary physical, mental, or emotional needs" of L.Y., and the "unavailability of a suitable placement after a determination by the court that a diligent search was conducted to find suitable placements meeting the preference criteria, but none has been located." *See* 25 C.F.R. § 23.132(c)(4), (5) (2016).

¶16 Accordingly, the court properly balanced case-specific factors when it determined departure from ICWA placement preferences was appropriate. Father has shown no abuse of discretion.

## B. Active Efforts Under ICWA

**¶17** Father argues the juvenile court committed reversible error when it found DCS made active efforts to prevent the breakup of L.Y.'s family. DCS must prove active efforts by clear and convincing evidence, but we review the evidence in the light most favorable to upholding the court's finding. *Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 421–22, ¶¶ 26–27 (App. 2011).

**¶18** We disagree that DCS failed to meet its burden of proving it made active efforts to prevent break-up of the relationship. Father does not specify what facts show DCS's failure to undertake active efforts, other than to argue that L.Y.'s placement in a non-ICWA-compliant placement did not constitute active efforts. Father cites no authority for the proposition that a non-ICWA-compliant placement means DCS has failed as a matter of law to undertake the active efforts. Instead, his only argument on this point rests on the non-ICWA placement.

**¶19** As noted above, the juvenile court did not abuse its discretion in deviating from ICWA placement preferences. Moreover, the court based its active efforts finding on significant evidence: Father was offered case management, substance abuse treatment and testing, visits with L.Y., and a psychological evaluation. DCS workers arranged transportation for Father to visit L.Y., and a DCS employee even accompanied Father to a store to teach him how to shop for L.Y.'s specific dietary needs. Father either chose not to engage or did not comply with many of the services DCS offered. Thus, the court did not err in finding that DCS made active efforts as required by ICWA.

## C. Best Interests

**¶20** When assessing the best interests of the child, the juvenile court's primary concern must be the child's stability and security. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 12 (2018). Termination is appropriate if "(1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Id.* at ¶ 13. In determining that severance was in L.Y.'s best interests, the court noted the presence of a statutory ground for severance had a negative effect on the child and that the immediate availability of an adoptive family for L.Y. favored severance. The court also found that based on Father's active alcohol abuse, L.Y. would suffer serious emotional or physical damage if Father's parental rights were not terminated.

**¶21** Father argues the juvenile court erred in determining termination of his rights was in L.Y.'s best interests but does not challenge any of the court's findings related to L.Y.'s best interests. Rather, Father essentially repeats the same contentions addressed above—that DCS did not comply with ICWA standards by failing to find an ICWA-complaint placement and failing to make active efforts to prevent the breakup of the Indian family. But as we explained, those arguments are not persuasive. Accordingly, reasonable evidence supports the best interests finding.

## CONCLUSION

**¶22** We affirm the juvenile court's order terminating Father's parental rights to L.Y.



AMY M. WOOD • Clerk of the Court
FILED: AA